**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on May 2, 2008**

| | | |
|---|---|---|
| | | **Case Number:** |
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **Grand Jury Original** |
| | **:** | |
| | **:** | **Violations:** |
| **v.** | **:** | |
| | **:** | **18 U.S.C. §§ 208, 216(a)(2) (Acts Affecting a** |
| | **:** | **Personal Financial Interest)** |
| | **:** | |
| **COURTNEY A. STADD,** | **:** | **18 U.S.C. § 1001(a)(2) (False Statements)** |
| | **:** | |
| **Defendant.** | **:** | **18 U.S.C. § 2 (Causing an Act To Be Done)** |

**INDICTMENT**

The Grand Jury charges:

**COUNT ONE**
**Acts Affecting a Personal Financial Interest**

Introduction

Unless specified otherwise, at all times material to this Indictment:

1.      From on or about April 28, 2005, to on or about June 25, 2005, COURTNEY A. STADD ("STADD") was a Special Government Employee in the Office of the Administrator at the National Aeronautics and Space Administration ("NASA") in Washington, D.C.  NASA was an agency within the executive branch of the Government of the United States.  Michael Griffin was the NASA Administrator.  STADD previously served as NASA Chief of Staff and White House Liaison from on or about January 22, 2001, to on or about July 12, 2003.

2.      STADD was the founder and President of Capitol Solutions, a management consulting services firm with clients in aerospace-related industries.  Capitol Solutions was located in Bethesda, Maryland.  In or about March 2005, STADD formed Capitol Alliance Solutions, LLC.  Capitol Alliance Solutions, LLC, was also located in Bethesda, Maryland.

3.      Mississippi State University ("MSU"), an institution of higher learning in Mississippi State, Mississippi, was a client of STADD and Capitol Solutions.  For the period of on or about January 1, 2005, to on or about December 31, 2005, STADD and Capitol Solutions had a consulting services agreement with MSU's GeoResources Institute ("GRI") to provide technical document editing and the preparation of community outreach and public communications materials.  Under that agreement, STADD was to be paid up to $85,000 in fees and travel costs.

4.      MSU was a member of the Mississippi Research Consortium ("MRC"), which was a coalition of Mississippi's four research universities.

5.      As part of an appropriations bill for fiscal year 2005, Congress provided a $15 million "earmark" for NASA's Earth Science Applications Program ("earmarked funds").  The conference report that accompanied the bill stated, "This funding increase will be used to support competitively-selected applications projects."

STADD's Knowledge of the Ethics Rules and His Representations to NASA

6.      In or about the late spring or summer of 2005, STADD received a packet of materials titled "Senior New Entrant Ethics Briefing" from Andrew Falcon ("Falcon"), an attorney in NASA's Office of the General Counsel ("NASA OGC").  Those materials included a section discussing the requirements of Title 18, United States Code, Section 208.

7.      In a memorandum dated April 18, 2005, STADD disclosed to NASA Chief of Staff Paul Morrell ("Morrell") and White House Liaison J.T. Jezierski that MSU was one of STADD's clients.  STADD wrote, "In order to avoid any appearance-related issues, I have recused myself from any and all agency meetings or activities affecting these organizations.  From the moment that I accepted my current position, I notified these clients that all of my interactions with them will be strictly confined to non-NASA issues."

8.      On or about April 19, 2005, STADD sent an e-mail to Falcon listing MSU as a client and asserting that STADD would "focus on non-NASA (viz., NOAA) matters."

9.      On or about April 27, 2005, STADD signed a Confidential Financial Disclosure Report in which he identified MSU as an asset and income source.  That form was also signed by Adam Greenstone ("Greenstone"), the Deputy Ethics Official and an attorney in the NASA OGC, on or about June 13, 2005.

10.     On or about May 1, 2005, STADD e-mailed Greenstone and Keith Sefton ("Sefton"), NASA's Deputy General Counsel, and noted, "I am strictly confining my role to that of an advisor and facilitator vis-a-vis organizational transition issues (with focus on drafting a Position Description for Associate Administrator) and whenever possible avoiding meetings or any situations that indirectly or directly affect my outside business activities."

11.     On or about May 11, 2005, STADD drafted an e-mail to Greenstone in which STADD stated that he was temporarily severing his relationship with a particular client (not MSU). STADD noted that he had "recused himself from any and all activities related to [that client's] ongoing NASA funded initiatives."   STADD also stated, "[That client] has an FY05 earmark pending with NASA and, frankly, I felt uncomfortable about ANY appearance issue."

12.     On or about May 12, 2005, in an e-mail to Greenstone, STADD disclosed that STADD had dinner with an MSU official but claimed that the "conversation involved no reference whatsoever to NASA."  STADD further wrote, "I explained up[ ]front that I am completely recused from any discussions or actions that might in anyway impinge on MSU.  I stressed that I am barred from any representational work vis-a-vis NASA on behalf of MSU."

13.     In an ethics agreement between STADD and NASA relating to his "federal service commencing April 28, 2005[,]" STADD asserted that he would "not perform any management or supervisory work, make final decisions on substantive policies, or otherwise function in the agency chain of command."  STADD also acknowledged that he had a financial interest in various entities, including MSU, and stated that he would "not participate in any matters involving any of these entities in the course of [his] NASA official duties" and that he would "not engage in any activities in which [he was] representing another person or organization, or [his] own private interests, or may appear to be doing these things to NASA."  STADD signed the ethics agreement on or about June 13, 2005.

## STADD's Participation in the Allocation of NASA Funds

14.     In an e-mail dated May 17, 2005, an MSU official informed STADD about a conversation that the MSU official had with another NASA official.  The MSU official relayed that (according to the other NASA official) Mary Cleave ("Cleave"), Acting Director of NASA's Earth-Sun System Division, had "said the $15M must be put out for a national competition – that competing it through the MRC will not do."  The MSU official lamented, "I have little or no faith that we will see even a majority of those funds in-state."

15.     On or about May 26, 2005, an MSU official sent an e-mail to STADD requesting a meeting with STADD.  STADD responded, "I wonder if we should meet off-campus given my relationship with MSU."  STADD also indicated that he was going to talk with Cleave the next day at 8:30 a.m. regarding the "earmarked funds."

16.     On or about May 27, 2005, STADD met with Cleave in STADD's office at NASA headquarters.  Because the "earmark" language in the conference report did not designate a particular recipient for the money, Cleave intended to allocate the entire $15 million of "earmarked funds" through a national competition.  During their meeting, STADD claimed that an arrangement had been made between the previous NASA Administrator and the Congressional delegation from Mississippi that the $15 million "earmark" would be spent in Mississippi.  STADD did not inform Cleave that he had an active consulting services agreement with MSU.  Following some discussion, STADD ultimately directed Cleave to spend $12 million of the "earmarked funds" in Mississippi (with the remaining $3 million left open for national competition).  After the meeting, Cleave told one of her subordinates responsible for earth science applications to allocate the "earmarked funds" according to STADD's instructions.

17.     On or about June 22, 2005, STADD contacted an MSU official by e-mail and stated:

> I understand that you were unhappy with the [Request for Information] in terms of the teaming requirement and dilution of funds to MSU, etc.  And overall I gathered it was framed in a way that constrains GRI from getting the bulk of the funds.  If true, I am beyond pissed.  I broke my [expletive] (excuse my language) pick to salvage the funds for [a NASA official].  I mean he had none before we recovered them.  I steered Mary Cleave so that [the NASA official] had clear running room . . . If I intervene anymore then all sorts of red flags will go up and I fear getting MSU and me in trouble.

18.     On or about June 25, 2005 (STADD's last day as a Special Government Employee at NASA), STADD told Morrell about an "earmark" from Senator Thad Cochran's office that was not being implemented like the senator wanted.  Senator Cochran represented Mississippi in the United States Congress.  Although STADD did not mention MSU, he was in fact referring to the "earmarked funds."  After another NASA employee mentioned that "earmark" to Morrell, Morrell directed both STADD and the other NASA employee to stay away from the "earmark."

19.     On or about July 28, 2005, in an e-mail to an MSU official, STADD wrote, "Morrell made a stupid comment to me two weeks ago when he admonished me and [the other NASA employee] to stay away from all this - 'I'd rather have an angry Cochran than get Mike in trouble.' The fact that he even framed it that way suggests naivete."

STADD's Financial Interest

20.     By letter dated August 23, 2005, James Huk, Contracting Officer at NASA, sent a Request for Proposal/Statement of Work to the MRC.  In or about December 2005 and January 2006, MSU was awarded $9,603,428 of the "earmarked funds" through five subcontracts under a pre-existing contract between NASA and the MRC.

21.     On or about June 1, 2005, STADD sent a signed invoice by Federal Express from Capitol Solutions to the GRI.  The invoice requested payment of $27,450 and highlighted STADD's "efforts (January – April 15, 2005) to ensure that the appropriate earth science research programs were appropriately refocused in areas of potential benefit to MSU/GRI."  Even though these listed dates preceded STADD's employment as a NASA Special Government Employee, STADD was in fact referring to actions he took to allocate the "earmarked funds" to the MRC and MSU during his tenure with NASA.  The "earmark" issue was the only matter that STADD was working on for the

GRI that could be described as "efforts (January – April 15, 2005) to ensure that the appropriate earth science research programs were appropriately refocused in areas of potential benefit to MSU/GRI."  On or about June 14, 2005, the GRI paid that invoice with a check in the amount of $27,450, which STADD deposited into his bank account at Sandy Spring Bank on or about June 22, 2005.

22.    On or about October 31, 2005, STADD sent an e-mail to an MSU official discussing STADD's future business goals.  In a section titled "Compensation Strategy," STADD proposed to increase his compensation from MSU by $3,000 per month, from $7,000 to $10,000 per month.  To justify a pay raise, STADD wrote, "The revectoring of the outstanding NASA contract to MSU/GRI, and the recovery of the earmarked NASA procurement are . . . examples of where I am hoping we can show that the return on investment in me is seeing a return for the institution."  In or about the summer of 2006, STADD and Capitol Alliance Solutions, LLC, entered into a consulting services agreement with the GRI for the period of on or about June 15, 2006, to on or about December 31, 2006, under which STADD was to be paid up to $60,000 in fees.

23.    From on or about April 28, 2005, through on or about June 25, 2005, in the District of Columbia and elsewhere, defendant COURTNEY A. STADD knowingly and willfully participated personally and substantially as a Government officer and employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation, and otherwise, in the allocation of NASA funds to the MRC and MSU, a particular matter in which STADD knew he had a financial interest.

All in violation of Title 18, United States Code, Sections 208, 216(a)(2), 2.

## COUNT TWO
### False Statements

24.     Paragraphs 1 through 22 are realleged as though fully set forth herein.

25.     On or about May 12, 2005, in the District of Columbia and elsewhere, defendant COURTNEY A. STADD, in a matter within the jurisdiction of the executive branch of the Government of the United States, namely, NASA, knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, that is, STADD sent and caused to be sent an e-mail to Greenstone in which STADD stated that, during a dinner with an MSU official the previous evening:

(a)     STADD's conversation with that MSU official involved no reference whatsoever to NASA; and

(b)     STADD had told that MSU official that:

(I)     STADD was completely recused from any discussions or actions that might in anyway impinge on MSU; and

(ii)     STADD was barred from any representational work vis-a-vis NASA on behalf of MSU,

when, in truth and in fact, as STADD then well knew, the conversation in question had involved a reference to NASA and, in that conversation, STADD had not made the two aforementioned statements to that MSU official.

All in violation of Title 18, United States Code, Sections 1001(a)(2), 2.

## COUNT THREE
### False Statements

26.     Paragraphs 1 through 22 are realleged as though fully set forth herein.

27.     On or about June 13, 2005, in the District of Columbia and elsewhere, defendant COURTNEY A. STADD, in a matter within the jurisdiction of the executive branch of the Government of the United States, namely, NASA, knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, that is, STADD stated in an ethics agreement regarding his federal service commencing on or about April 28, 2005, which STADD signed and submitted and caused to be submitted to NASA officials, that:

(a)     STADD would not perform any management or supervisory work, make final decisions on substantive policies, or otherwise function in the agency chain of command;

(b)     STADD would not participate in any matters involving MSU in the course of his NASA official duties; and

(c)     STADD would not engage in any activities in which he was representing another person or organization, or his own private interests, or may appear to be doing these things to NASA,

when, in truth and in fact, as STADD then well knew, he had already performed work on, participated in, and engaged in the allocation of NASA funds to the MRC and MSU as a NASA Special Government Employee, and intended to do so in the future.

All in violation of Title 18, United States Code, Sections 1001(a)(2), 2.

A TRUE BILL:

_____
Foreperson

_____/s/_____
Attorney of the United States in
and for the District of Columbia